**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee/*
      *Cross-Appellant*,

v.

MICHAEL LINDSAY,
      *Defendant-Appellant/*
      *Cross-Appellee.*

</td><td>

Nos. 16-10349
    16-10384

D.C. No.
3:12-cr-00873-
CRB-1

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted May 14, 2018
Withdrawn from Submission May 21, 2018
Re-submitted March 13, 2019
San Francisco, California

Filed July 23, 2019

Before:  J. Clifford Wallace and N. Randy Smith, Circuit
Judges, and Deborah A. Batts,[*] District Judge.

---

[*] The Honorable Deborah A. Batts, United States District Judge for
the Southern District of New York, sitting by designation.

Opinion by Judge Wallace

---

**SUMMARY**[**]

---

### Criminal Law

The panel affirmed a jury conviction for illicit sexual conduct abroad and other crimes, vacated defendant's sentence, and remanded for resentencing.

Defendant had sex with a minor in the Philippines. Agreeing with the analysis of the Fourth and Tenth Circuits, the panel held that 18 U.S.C. § 2423(c), which prohibits engaging in illicit sexual conduct in foreign places, did not exceed Congress's authority under the Foreign Commerce Clause, as applied to the criminalization of non-commercial sexual abuse of a minor. Applying rational basis review, the panel concluded that the elements of the crime fairly relate to foreign commerce.

The panel held that the district court did not err in its jury instruction on the intent element of § 2423(b), which prohibits traveling abroad with intent to engage in illicit sexual conduct. The district court also did not err by failing to instruct the jury on a "reasonable belief" defense to § 2423(b).

The panel held that the district court did not abuse its discretion by excluding defendant's foreign deposition testimony, excluding evidence of an extortion plot, or

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

admitting evidence of defendant's sexual relations with other underage individuals.

On the government's cross-appeal of the sentence, the panel held that the district court miscalculated the Sentencing Guidelines range by failing to apply an obstruction of justice enhancement under U.S.S.G. § 3C1.1. The panel therefore vacated the sentence and remanded for resentencing.

---

## COUNSEL

Ethan A. Balogh (argued) and Dejan M. Gantar, Coleman & Balogh LLP, San Francisco, California, for Defendant-Appellant/Cross-Appellee.

Philip Kopczynski (argued), Assistant United States Attorney; J. Douglas Wilson, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee/Cross-Appellant.

---

## OPINION

WALLACE, Circuit Judge:

Michael Lindsay was convicted of travel with intent to engage in illicit sexual conduct, engaging in illicit sexual conduct abroad, attempted witness tampering, and obstruction of justice. At trial, Lindsay raised constitutional, statutory, and evidentiary objections, which the district court overruled. At sentencing, the United States asked the district court to enhance Lindsay's base offense level with an

obstruction of justice enhancement, which the district court declined to do. Lindsay appeals from his conviction; the United States cross-appeals Lindsay's sentence. We have jurisdiction over Lindsay's appeal under 28 U.S.C. § 1291 and the United States' cross-appeal under 18 U.S.C. § 3742, and we affirm the conviction, vacate the sentence, and remand for resentencing.

I.

A.

Lindsay is a United States citizen born in 1959. In 2012, Lindsay frequently traveled abroad to spend time in the Philippines, where he owned a home.

S.Q. is a Philippine resident born in 1998. According to her testimony at trial, S.Q. met Lindsay in October 2011 near his home in Manila. That night, S.Q., her mother, and other family members stayed at Lindsay's home, as part of a scheme to frame Lindsay and extort money from him. No sexual activity between S.Q. and Lindsay occurred that night. S.Q. and an older friend later returned to Lindsay's home at her mother's urging. S.Q. testified that her friend and Lindsay would often have sex, and that Lindsay paid S.Q.'s mother in exchange. S.Q.'s mother pressured S.Q. to do the same, and S.Q. did so in May 2012. S.Q. testified that she and Lindsay had sex "a lot of times" in May, again in August, and that Lindsay paid her mother after every encounter. S.Q. saw Lindsay for the last time on August 22, 2012. After they had sex that day, S.Q.'s father "showed up" at the condo and took S.Q. home. S.Q.'s father then went with her to the Philippine police, where she reported the sexual activities. United States law enforcement became involved in September 2012, when they received a "lookout" from Philippine authorities regarding Lindsay. United States

authorities then detained Lindsay when he returned to the United States, and began investigating his activities in the Philippines.

B.

The United States filed a criminal complaint against Lindsay in November 2012, and indicted Lindsay in December on two counts of violating 18 U.S.C. § 2423. The indictment charged Lindsay with traveling abroad with intent to engage in illicit sexual conduct, 18 U.S.C. § 2423(b), and engaging in illicit sexual conduct in foreign places, 18 U.S.C § 2423(c). Lindsay was released pre-trial. One condition of his release was that he make no contact with witnesses.

In March 2014, Lindsay moved to take depositions of six individuals in the Philippines. The district court granted the motion, vacated the upcoming trial date, and issued a letter rogatory in August to the judicial authority of the Philippines requesting assistance with the depositions. The district court issued a second letter rogatory in July 2015 again requesting depositions, after the Philippine court responded by suggesting written interrogatories. The record does not reflect whether the Philippine judiciary ever responded to the second letter.

While the second request to take depositions abroad was pending, Lindsay moved to dismiss count two: engaging in illicit sexual conduct in foreign places. *See* 18 U.S.C. § 2423(c). Lindsay argued that Congress exceeded its constitutional authority under the Commerce Clause when it enacted the non-commercial aspect of section 2423(c). The district court denied that motion in November 2015.

Meanwhile, with no response from the Philippine court forthcoming, Lindsay's counsel traveled to the Philippines and deposed five witnesses there.[1] Lindsay's counsel advised the Assistant United States Attorney assigned to the case of the depositions and invited the United States to participate. The government declined, explaining that under the Consular Convention the Philippines would not allow United States consular officials to attend depositions not presided over by a Philippine judge.

In January 2016, the United States moved to revoke Lindsay's pre-trial release, alleging that Lindsay had violated his conditions of release by repeatedly contacting witnesses. The United States argued that Lindsay had contacted defense witnesses, told them not to contact him through email addresses that the government was aware of, instructed them to testify falsely on his behalf, told them to delete his messages to them, and wired money to them. A magistrate judge revoked Lindsay's pre-trial release, and shortly thereafter the United States filed a superseding indictment charging Lindsay with attempted witness tampering, 18 U.S.C. § 1512(b), obstruction of justice, 18 U.S.C. § 1503, and contempt of court, 18 U.S.C. § 401(3).

In March 2016, Lindsay moved to admit the five videotaped depositions taken in the Philippines, acknowledging their hearsay nature but arguing that they were admissible as former testimony. *See* Fed. R. Evid. 804(b)(1). The United States opposed the motion, arguing that the hearsay exception did not apply. The district court held a hearing, ruled that the depositions were inadmissible,

---

[1] One of the six individuals Lindsay originally sought to depose was in custody in the Philippines and could not attend a voluntary deposition.

and denied the motion. In subsequent pre-trial proceedings, the district court also ruled that messages exchanged between Lindsay and others about his sexual relations with other teenage girls in the Philippines were admissible under Evidence Rule 404(b). The district court ruled that such evidence, though prejudicial, was "admissible to show his state of mind, to show his plan, to show to his opportunity, . . . in addition to being inextricably intertwined with the offense itself," and that the probative value of the evidence outweighed its prejudicial effect.

The case proceeded to a jury trial on the first four counts in May.[2] The government's theory of the case was that Lindsay traveled to the Philippines with the purpose of having sex with S.Q., and that once there, he did have sex with her. The United States pressed two theories of illicit sexual conduct to the jury: either that Lindsay and S.Q. had commercial sex and S.Q. was under 18, or Lindsay and S.Q. had non-commercial sex and S.Q. was between the ages of 12 and 16. Either way, the prosecution argued, Lindsay had engaged in illicit sexual activity. In support of its theory, the United States introduced S.Q.'s testimony and evidence to corroborate it, including a notebook found in Lindsay's luggage containing a list of names, phone numbers, and dates. The list included S.Q.'s name and phone number, along with the names of other girls that appeared in the messages the district court ruled pre-trial were admissible.

Lindsay's defense focused on S.Q.'s credibility and the lack of corroborating witnesses. Lindsay highlighted internal contradictions in S.Q.'s testimony and introduced witnesses who contradicted her account, including S.Q.'s boyfriend.

---

[2] The district court dismissed the fifth count (contempt of court) at sentencing.

During direct examination of S.Q.'s boyfriend, Lindsay's counsel began asking him questions about his cell phone and messages to S.Q. After Lindsay's counsel began asking questions about the existence of specific messages, the district court called a sidebar conference and asked if Lindsay was going to introduce the messages into evidence. When Lindsay's counsel responded affirmatively, the court asked, "Does this fall within reciprocal discovery or does it not," to which counsel responded, "I just found out about it about 40 minutes ago." The district court then asked if Lindsay had informed the United States of his intention to introduce the messages before beginning the direct examination, and Lindsay's counsel responded, "No." The district court ruled that it was "[t]oo late" to have the United States examine the cell phone before resuming questioning, and instructed the jury to disregard the previous questions about the cell phone. Lindsay also attempted to elicit testimony about S.Q.'s father speaking to S.Q.'s grandmother at a Philippine courthouse and asking for money, but the district court ruled that whether or not that occurred was collateral to the main issues in the case.

The jury was instructed on the final day of trial. Relevant to this appeal, the district court instructed that for the section 2423(b) count, the United States "does not have to prove that Defendant traveled in foreign commerce for the sole and exclusive purpose of engaging in illicit sexual conduct. The government must prove that a dominant, significant, or motivating purpose of Defendant's travel in foreign commerce was to engage in illicit sexual conduct." Lindsay did not object to this instruction. The district court also instructed, on the section 2423(c) count, that it was "a defense to (1) an illicit sex act . . . but not (2) a commercial sex act . . . if Defendant reasonably believed that the other person had attained the age of 16 years." Lindsay did not

request, nor did the district court give, the same instruction for the section 2423(b) count.

The jury returned a verdict of guilty on all four counts. The verdict form did not distinguish between commercial sexual conduct and non-commercial sexual conduct as the basis for the sex offense counts.

In post-trial proceedings, Lindsay filed a motion for a new trial based in part on his mid-trial discovery of the messages on S.Q.'s boyfriend's cell phone. The motion included a translation from Tagalog into English of the complete message Lindsay had attempted to introduce at trial. The district court denied that motion, ruling in part that the message Lindsay had sought to have admitted was "inadmissible hearsay."

The district court sentenced Lindsay in August 2016. The district court separately grouped the sex offense convictions and obstruction of justice convictions and for the former arrived at a total offense level of 31. The United States then argued that the level should be increased to 33 for obstructive conduct. *See* USSG § 3C1.1 (providing for a two-level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice"). The district court declined to apply the enhancement, explaining that of the obstructive conduct alleged,[3] the conduct "that was established beyond any doubt" was the conduct charged in counts three and four, and the sentence for those counts "will take care of it." When

---

[3] The United States alleged that Lindsay engaged in additional uncharged obstructive conduct, but the district court found that the evidence of that conduct was not "satisfactory." The United States does not challenge that finding on appeal.

the United States argued that the enhancement applied even if the district court only considered the obstructive conduct for which Lindsay was separately convicted, the district court again demurred, explaining that to do so would "count it twice." The district court subsequently imposed a sentence of 96 months for the first group of counts, based on a Guidelines range of 108–135 months. The district court imposed a sentence of 21 months for the second group of charges, to run concurrently with the 96-month sentence.

Lindsay appealed, challenging the district court's denial of his motion to dismiss, jury instructions, and evidentiary rulings. The United States cross-appealed, challenging the district court's sentence. We heard argument and submitted the case in May 2018, but withdrew submission pending *United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018) and *United States v. Abramov*, 741 F. App'x 531 (9th Cir. 2018). Because neither of those decisions fully resolved this appeal, we resubmitted the case in March 2019 and now issue this opinion.

II.

"We apply de novo review to a denial of a motion to dismiss a criminal indictment on constitutional grounds." *United States v. Andaverde*, 64 F.3d 1305, 1308–09 (9th Cir. 1995). "We review de novo whether the district court's jury instructions misstated or omitted an element of the charged offense and review the district court's formulation of jury instructions for abuse of discretion." *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012). "We review a district court's evidentiary rulings for an abuse of discretion and its interpretation of the Federal Rules of Evidence *de novo*. We also review *de novo* whether a district court's evidentiary rulings violated a defendant's constitutional rights." *United States v. Waters*, 627 F.3d 345, 351–52 (9th

Cir. 2010). "We review a district court's construction and interpretation of the Guidelines de novo and its application of the Guidelines to the facts for abuse of discretion." *United States v. Johnson*, 913 F.3d 793, 799 (9th Cir. 2019) (quoting *United States v. Simon*, 858 F.3d 1289, 1293 (9th Cir. 2017) (en banc)).

III.

We begin our analysis with Lindsay's appeal. Lindsay assigns error to the district court on six grounds: (1) that the district court erred in denying his motion to dismiss because enacting 18 U.S.C. § 2423(c) exceeded Congress's authority under the Commerce Clause; (2) that the district court erred in its instruction on the intent element of 18 U.S.C. § 2423(b); (3) that the district court erred by failing to instruct the jury on a "reasonable belief" defense to 18 U.S.C. § 2423(b); (4) that the district court erred or abused its discretion by excluding the Philippine depositions; (5) that the district court abused its discretion by excluding S.Q.'s Facebook messages and related "extortion plot" evidence; and (6) that the district court abused its discretion by admitting evidence that Lindsay had sex with other Philippine minors. Lindsay also argues that cumulative error requires us to vacate his conviction if vacatur is not compelled by any error standing alone. We address each of his arguments in turn.

A.

The Commerce Clause provides that "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. We are concerned here with the first part of this clause, "Commerce with foreign Nations," often referred to as the Foreign Commerce Clause.

*See United States v. Clark*, 435 F.3d 1100, 1102 (9th Cir. 2006). We must decide whether Congress acted within the boundaries of the Foreign Commerce Clause when it enacted 18 U.S.C. § 2423(c), as applied to the criminalization of non-commercial sexual abuse of a minor.

We begin with the text of the relevant statute. At the time of Lindsay's conduct, section 2423(c) provided:

> Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(c) (2012).[4] Section 2423(f) in turn defined "illicit sexual conduct" as:

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or

---

[4] The statute now punishes any United States citizen "who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c) (2018); *see* Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54, § 1211(b) (Mar. 7, 2013); *see also Pepe*, 895 F.3d at 682, 686.

> (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age.

18 U.S.C. § 2423(f) (2012).[5] Finally, the use of "chapter 109A" in section 2423(f)(1) referred to 18 U.S.C. § 2241–2248 which, as relevant here, provided:

> Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly engages in a sexual act with another person who —
>
> > (1) has attained the age of 12 years but has not attained the age of 16 years; and
> >
> > (2) is at least four years younger than the person so engaging;
>
> or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

---

[5] The current statute is identical in relevant part, but also includes "production of child pornography" as illicit sexual conduct. 18 U.S.C. § 2423(f) (2018); *see* Justice for Victims of Trafficking Act of 2015, Pub. L. 114-22, 129 Stat. 227, § 111(a) (May 29, 2015).

18 U.S.C. § 2243(a) (2012).[6]

Altogether then, section 2423(c) criminalized non-commercial sexual activity between a United States citizen of Lindsay's age and a minor between the ages of 12 and 16, if the citizen also traveled in foreign commerce. Although we once interpreted these elements as requiring transit in foreign commerce followed by illicit sexual conduct, *Clark*, 435 F.3d at 1107, we have recently clarified that the statute proscribes illicit sexual conduct *while* traveling, where traveling is broader than transit and encompasses the entire trip or tour, *Pepe*, 895 F.3d at 685–86. The question before us is whether it was within Congress's power to criminalize such conduct.

We have some assistance when we answer that question. In *Clark*, we addressed the constitutionality of section 2423(c) as applied to commercial sex acts. 435 F.3d at 1103. There, we explained the history of section 2423(c) and the text, structure, and history of the Commerce Clause, *id.* at 1110–14, ultimately establishing the governing framework for our review and concluding that the act "implicates foreign commerce to a constitutionally adequate degree." *Id.* at 1114. Our analysis here must begin from and abide by that framework. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). We therefore begin with a description of our reasoning in *Clark*.

Our analysis in *Clark* started by considering the Commerce Clause as a whole, and how Congress's powers under the Foreign Commerce Clause related to the Interstate Commerce Clause and Indian Commerce Clause. 435 F.3d at 1110–13. Recognizing the different opinions on the

---

[6] The current statute is identical. 18 U.S.C. § 2243(a) (2018).

subjects, we explained that "[r]egardless of how separate the three subclauses may be in theory, the reality is that they have been subject to markedly divergent treatment by the courts" in light of the "considerably different interests at stake when Congress regulates in the various arenas." *Id.* at 1111. We then compared the Supreme Court's approach to the Interstate Commerce Clause, defined by the three familiar categories of permissible regulation, *see United States v. Lopez*, 514 U.S. 549, 558–59 (1995); *United States v. Morrison*, 529 U.S. 598, 609–14 (2000), with its approach to the Indian Commerce Clause, which is not dependent on "the rigid categories of *Lopez* and *Morrison*." *Clark*, 435 F.3d at 1112–13. We recognized that the Foreign Commerce Clause was more akin to the Indian Commerce Clause than the Interstate Commerce Clause in this way, as the Supreme Court "has been unwavering in reading Congress's power over foreign commerce broadly." *Id.* at 1113. We also added that there were structural reasons to think that the Foreign Commerce Clause might be broader than the Interstate Commerce Clause, because "[f]ederalism and state sovereignty concerns do not restrict Congress's power over foreign commerce." *Id.*; *see also Japan Line, Ltd. v. Cty. of Los Angeles*, 441 U.S. 434, 448 (1979) ("[T]he Founders intended the scope of the foreign commerce power to be the greater"); *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 57 (1933) ("The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce").

Based on this broad understanding of the Foreign Commerce Clause, we announced that we would review section 2423(c) "under the traditional rational basis standard." *Clark*, 435 F.3d at 1114 (citing *Gonzales v. Raich*, 545 U.S. 1, 26 (2005)). The relevant question thus became "whether the statute b[ore] a rational relationship to

Congress's authority under the Foreign Commerce Clause." *Id.* While examining the statute through the lens of the *Lopez*/*Morrison* categories was one way of approaching this question, we made clear that "the categories have never been deemed exclusive or mandatory," comparing such forced analysis to "one of the stepsisters trying to don Cinderella's glass slipper." *Id.* at 1116. Instead, we compared the elements established by section 2423(c) with the "species of commercial intercourse between the United States and foreign nations," *id.* at 1114 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 193 (1824)), concluding that a U.S. citizen's travel to a foreign country and commercial sex act with a person abroad were each commercial activities that formed part of "foreign trade and commerce," *id.* at 1114–15. Because both elements in combination "fairly relate[d] to foreign commerce," section 2423(c) "implicate[d] foreign commerce to a constitutionally adequate degree." *Id.* at 1114.

*Clark* thus establishes the governing framework for our review here. We must apply rational basis review to section 2423(c), asking whether its elements fairly relate to foreign commerce. We already know that the first element, traveling abroad, does so. *Id.* at 1114. But in *Clark* we reserved our decision on whether section 2423(c) could constitutionally apply to non-commercial conduct. *Id.* at 1110 & n.16. Therefore, we must decide whether the second element also fairly relates to foreign commerce when it is based not on "any commercial sex act . . . with a person under 18 years of age," *see* 18 U.S.C. § 2423(f)(2) (2012), but on non-commercial sex "with another person who . . . has attained the age of 12 years but has not attained the age of 16 years," *see id.* § 2243(a) (2012). We cannot uphold Lindsay's conviction based on the commercial part upheld in *Clark* because there was no special verdict form and the United

States urged the jury to convict on either the commercial part or the non-commercial part, making it impossible for us to tell what legal theory the jury's conviction rests upon. *See Leary v. United States*, 395 U.S. 6, 31–32 (1969).

We hold that non-commercial sex with a minor abroad fairly relates to foreign commerce, and that Congress accordingly acted within its constitutional bounds when it enacted the non-commercial part of section 2423(c). The question is admittedly difficult, having led judges across the country to reach different outcomes. *Compare United States v. Durham*, 902 F.3d 1180, 1210 (10th Cir. 2018) (upholding section 2423(c) under broader power than under Interstate Commerce Clause); *United States v. Bollinger*, 798 F.3d 201, 218 (4th Cir. 2015) (same), *with United States v. Pendleton*, 658 F.3d 299, 308 (3rd Cir. 2011) (upholding section 2423(c) under *Lopez*/*Morrison* framework), *and Durham*, 902 F.3d at 1241 (Hartz, J., dissenting) (concluding that section 2423(c) exceeds Foreign Commerce Clause authority); *United States v. Reed*, 2017 WL 3208458, at *14 (D.D.C. July 27, 2017) (same); *United States v. Al-Maliki*, 787 F.3d 784, 793–94 (6th Cir. 2015) (concluding that it was likely that section 2423(c) was unconstitutional, but that such error was not plain). "We see no need to re-plow the same ground here" canvassing the many arguments discussed in those cases. *See CFPB v. Seila Law LLC*, 923 F.3d 680, 682 (9th Cir. 2019). Instead, we agree with our sister circuits' analysis in *Durham* and *Bollinger*, and briefly explain the most important features of section 2423(c) that lead us to our conclusion.

First, and most important, we consider the non-commercial part to be an essential component of Congress's overall scheme to combat commercial sex tourism by Americans abroad. International sex tourism is a multi-

billion dollar industry that relies on the exploitation of women and children in dire economic circumstances. *See* Kalen Fredette, *International Legislative Efforts to Combat Child Sex Tourism*, 32 B.C. Int'l & Comp. L. Rev. 1, 4–12 (2009). Such exploitation can feed the commercial sex tourism industry in many ways. For example, non-commercial sexual abuse of minors can drive commercial demand for sex with minors by reinforcing the idea that such conduct is acceptable, or by allowing traffickers to use non-commercial arrangements to entice patrons into engaging in subsequent commercial behavior. By serving as a "gateway," non-commercial conduct can fuel commercial demand. *See id.* at 8 ("[S]exual arrangements with prostituted children can look remarkably non-commercial, with prostitutes performing both sex labor and non-sex labor for patrons"). Thus, Congress rationally could have concluded that non-commercial illicit sexual conduct abroad relates to commercial illicit sexual conduct abroad. *See Durham*, 902 F.3d at 1211; *Bollinger*, 798 F.3d at 219. Because the prohibition on commercial illicit sexual conduct is constitutional, the prohibition on non-commercial illicit sexual conduct is also constitutional as an essential part of that prohibition.

Second, Congress could have rationally concluded that the American appetite for sex with minors abroad substantially affects other aspects of foreign commerce because sex with minors is generally illegal in the United States. If Americans believe that traveling to a particular foreign country includes the opportunity for unregulated, non-commercial illicit sexual conduct, they may travel to that country when they otherwise would not, and they may pay more in airfare, lodging costs, vacation packages, or simply stay in the country longer spending money on other things. *See Durham*, 902 F.3d at 1211; *Bollinger*, 798 F.3d

at 219; *see also* Fredette, *supra*, at 9 ("Between 2–14% of the GDPs of Indonesia, Malaysia, the Philippines, and Thailand can be linked to sex tourism"). These substantial collateral effects of American sex tourism, which unquestionably constitute transactions in foreign commerce, thus flow directly from the non-commercial sexual activity prohibited by section 2423(c). These collateral effects make non-commercial illicit sexual activity abroad related to the "species of commercial intercourse between the United States and foreign nations." *See Clark*, 435 F.3d at 1114 (quoting *Gibbons*, 22 U.S. at 193).

These two features together lead us to conclude that section 2423(c)'s second element fairly relates to foreign commerce, even when predicated solely on non-commercial sex with a minor between the age of 12 and 16. Additionally, as we have already explained, section 2423(c)'s first element of travel abroad also fairly relates to foreign commerce. We are thus left here with the same situation we had in *Clark*: the "combination of requiring travel in foreign commerce, coupled with engagement in [non-commercial sexual activity impacting foreign commerce] while abroad, implicates foreign commerce to a constitutionally adequate degree." *See Clark*, 435 F.3d at 1114. Accordingly, the district court did not err by denying Lindsay's motion to dismiss.

In light of our holding, we need not address the United States's alternative arguments that section 2423(c) could have been enacted pursuant to Congress's treaty power, *see Missouri v. Holland*, 252 U.S. 416, 432 (1920), or its inherent power over international affairs, *see United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936).

B.

We next turn to Lindsay's statutory arguments, as reflected in the district court's instructions to the jury on the section 2423(b) count. Lindsay asserts that the district court erred by (1) failing to instruct the jury that the United States needed to prove that Lindsay's travel would not have occurred but for his intent to engage in illicit sexual activity; and (2) failing to instruct the jury that Lindsay could not be convicted based on non-commercial sexual conduct if he reasonably believed that S.Q. was 16. We address each argument in turn.

1.

Lindsay did not object to the district court's jury instructions concerning 18 U.S.C. § 2423(b)'s intent element, so we review only for plain error. *See United States v. Depue*, 912 F.3d 1227, 1234 (9th Cir. 2019) (en banc). Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quotation marks and citations omitted). "Plain" error is error that is "clear" or "obvious." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Here, there is no obvious error. In 2012, 18 U.S.C. § 2423(b) provided that it was illegal for a United States citizen to "travel[] in foreign commerce, for the purpose of

engaging in any illicit sexual conduct with another person."[7] Lindsay argues that "for the purpose of" clearly refers to a but-for causation standard, contrary to the "dominant, significant, or motivating" standard the district court applied. However, this contention "ignores the human ability and propensity to act in light of multiple motives and purposes." *United States v. Lukashov*, 694 F.3d 1107, 1118 (9th Cir. 2012). It is not obviously wrong to interpret "for the purpose of" as applying to any dominant, significant, or motivating purpose to account for that fact, as a plain understanding of the phrase can encompass multiple intentions. For instance, in common conversation a person can travel to the grocery store "for the purpose of" buying milk and getting gas if both milk and gas are motivating reasons for the excursion.

Lindsay's argument to the contrary relies on *Burrage v. United States*, 571 U.S. 204 (2014). However, *Burrage* is inapposite here. In that case, the Supreme Court held that the phrase "results from" in 21 U.S.C. § 841 refers to but-for causation. *Id.* at 218–19. So, reasons Lindsay, "for the purpose of" must also refer to but-for causation. But "results from" and "for the purpose of" are materially different phrases: Whereas "results from" necessarily implies causality, "for the purpose of" does not. *Burrage* therefore does not control here, and the district court did not plainly err by instructing the jury that Lindsay traveled in foreign commerce for the purpose of engaging in illicit sexual

---

[7] The statute now prohibits traveling in foreign commerce "with a motivating purpose of engaging in any illicit sexual conduct with another person." 18 U.S.C. § 2423(b) (2018); *see* Abolish Human Trafficking Act of 2017, Pub. L. 115-392, 132 Stat. 5250, § 14 (Dec. 21, 2018).

activity if that purpose was dominant, significant, or motivating.

2.

We likewise reject Lindsay's argument that the district court should have instructed the jury that it was a defense to 18 U.S.C. § 2423(b) if he believed that S.Q. was 16. Lindsay did not request such an instruction from the district court, so our review is again for plain error. *See Depue*, 912 F.3d at 1234. Once more, under plain error review there was no "obvious" error, and therefore no reversible error. *See Johnson*, 520 U.S. at 467.

There are two "reasonable belief" defenses that could apply to this case.[8] First, 18 U.S.C. § 2423(g) provides a defense to illicit sexual conduct based on commercial sex acts with minors under the age of 18, if the defendant establishes that he or she reasonably believed that the minor had attained the age of 18 years. Lindsay does not argue that this defense applied to him or that an instruction based on it should have been given. Second, 18 U.S.C. § 2243(c)(1) provides a defense to prosecutions under section 2243(a), if the defendant establishes by a preponderance of the evidence that he or she reasonably believed that the minor had attained the age of 16. Lindsay argues that this defense applies to the section 2423(b) charge against him because section

---

[8] The current statutes are identical in relevant part to the statutes in force at the time. *See* 18 U.S.C. § 2423(g) (2012); 18 U.S.C. § 2243(c)(1) (2012). The only distinction is section 2423(g) now requires the defendant to prove his or her reasonable belief by clear and convincing evidence, and at the time it required only a preponderance of the evidence. *See* 18 U.S.C. § 2423(g) (2018); 18 U.S.C. § 2423(g) (2012); Justice for Victims of Trafficking Act of 2015, § 111(b). This distinction is not relevant to our decision.

2423(f)(1) defines "illicit sexual conduct," as used in section 2423(b), as a sexual act with a person under 18 years of age "that would be in violation of [18 U.S.C. § 2243(a)]."

Lindsay's argument fails because the language of both sections 2243(c)(1) and 2423(g) provide that the defense applies in a prosecution under that relevant section: 18 U.S.C. § 2243(c)(1) states that the defense applies "[i]n a prosecution under subsection (a) of this section" and 18 U.S.C. § 2423(g) states that the defense applies "[i]n a prosecution under this section based on illicit sexual conduct as defined in subsection (f)(2)." This language suggests that Congress limited each affirmative defense to specific prosecutions. Thus, the section 2243(c)(1) defense likely applies to section 2243(a) prosecutions, and the section 2423(g) defense likely applies to section 2423 prosecutions, but the section 2243(c)(1) defense likely does not apply section 2423 prosecutions. At the very least, the section 2243(c)(1) defense does not "obviously" apply here, precluding plain error correction. To the extent this means the district court erred by allowing the defense as to the section 2423(c) count, that error was harmless, as it could have only helped Lindsay.

We therefore hold that there was no plain error in the district court's jury instructions.

## C.

We next turn to Lindsay's evidentiary objections. Lindsay argues that the district court erred or abused its discretion by (1) excluding his foreign deposition testimony, (2) excluding S.Q.'s Facebook messages and related extortion evidence, and (3) admitting evidence of Lindsay's sexual relations with other underage individuals. We address each in turn.

1.

Lindsay does not argue on appeal, nor did he in the district court, that the Philippine depositions are not hearsay subject to Rule 802's bar against admission. *See* Fed. R. Evid. 801, 802. Therefore, the depositions were only admissible if some exception to the hearsay rule applied. Before the district court, Lindsay offered two evidentiary exceptions: the former testimony exception for unavailable declarants, Fed. R. Evid. 804(b)(1), and the residual exception, Fed. R. Evid. 807. Lindsay also argued that excluding the depositions would violate his right to due process. The district court rejected all three arguments and excluded the evidence.

We hold that the district court did not abuse its discretion or violate Lindsay's constitutional right to present a defense by excluding the depositions. First, the former testimony exception requires, as relevant to this case, that (1) the declarant be unavailable at trial, (2) the testimony be given at a lawful deposition, and (3) the United States had an opportunity and similar motive to develop the testimony through cross-examination. *See* Fed. R. 804(a), (b)(1). The district court found that Lindsay had not shown that the deponents were unavailable at trial, and that finding is not clearly erroneous in light of Lindsay's failure to support the reasonable means he used to obtain their attendance, especially given that the United States offered to help secure visas for the witnesses. In fact, two of the five witnesses that Lindsay argued were unavailable ultimately traveled to the United States and testified at trial. Accordingly, the district

court did not abuse its discretion by declining to apply this exception.[9]

Second, as relevant here the residual exception requires that the hearsay statement (1) have equivalent guarantees of trustworthiness to other hearsay exceptions and (2) best serve the purpose of the rules and the interests of justice. Fed. R. Evid. 807(a). The district court here did not abuse its discretion by declining to apply the residual exception because equivalent guarantees of cross-examination were not present. First, the government did not have an adequate opportunity to cross-examine the deponents. *Cf. United States v. Sanchez-Lima*, 161 F.3d 545, 547–48 (9th Cir. 1998) ("The government had an opportunity to develop the testimony of these witnesses before they were deported, and the government also had notice and the option to participate in taking the videotaped statements"). Second, the probative value of the deponents' testimony was uncertain because it was unclear whether their oath subjected them to perjury and what effect Lindsay's obstructive pre-trial conduct may have had on their testimony, especially absent cross-examination. The district court accordingly did not abuse its discretion by declining to apply the residual exception.

---

[9] Further, even assuming the remaining three witnesses were actually unavailable, the only evidence of Philippine law before the district court suggested that the depositions were not "lawful" because they were not presided over by a Philippine judge. *See United States v. Salim*, 855 F.2d 944, 953 (2d Cir. 1988) (explaining that Rule 804 "lawfulness" in this context refers to Civil Rule 28(b), as incorporated by Criminal Rule 15(e)). Lindsay's argument that he was required only to abide by the text of Rule 28, and not Philippine law, is unavailing. *See id.* ("Rule 28 . . . was specifically designed to permit depositions to be taken in the manner provided by the law of the foreign country in which the deposition is conducted").

Finally, the constitutional guarantee of the right to present a defense "is not absolute, since the adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments." *United States v. Evans*, 728 F.3d 953, 959 (9th Cir. 2013) (quotation marks and citations omitted). In cases such as this one, where exclusion of evidence by the district court was not an abuse of discretion under the Federal Rules of Evidence, we must consider "the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense," before we hold that a constitutional violation has taken place. *United States v. Stever*, 603 F.3d 747, 756 (9th Cir. 2010) (quoting *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003)). Balancing these factors, the exclusion did not deprive Lindsay of his right to present a defense because the excluded evidence was neither significantly probative nor reliable. For example, the fact that one witness testified that she was with S.Q. on one of the nights S.Q. claimed she had sex with Lindsay, and did not witness any sexual activity, is not significantly probative of the central issue in the case given that Lindsay and S.Q. had sex several times and Lindsay otherwise attacked S.Q.'s credibility. Additionally, another witness's testimony that she heard S.Q. discussing "setting up" Lindsay was not particularly important given that S.Q. admitted that the family made contact with Lindsay as part of an extortion scheme. Finally, even considering the limited probative value of the excluded depositions, they were unreliable under the circumstances presented here — the depositions occurred against the backdrop of Lindsay's pre-trial attempted witness tampering and obstruction of justice. Accordingly, no constitutional error occurred.

The district court therefore did not err or abuse its discretion by excluding the Philippine depositions.

2.

We likewise reject Lindsay's argument that the district court abused its discretion by excluding S.Q.'s Facebook messages discovered mid-trial. The thrust of Lindsay's argument is that he did not commit a discovery violation because the messages were not in his "possession, custody, or control." *See* Fed. R. Crim. P. 16(b)(1)(A)(i). However, Lindsay's counsel represented to the district court that she had found out about the messages 40 minutes before the court raised the issue; i.e., prior to the current round of questioning. Lindsay's counsel therefore knew about the messages before she began questioning S.Q.'s boyfriend, and the duty of disclosure continued to apply. *See* Fed. R. Crim. P. 16(c).

The closer question is whether the district court abused its discretion by excluding the evidence in its entirety, rather than attempting to craft a narrower sanction. Although Rule 16 allows district courts to exclude untimely evidence, "[e]xclusion is an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'" *United States v. Finley*, 301 F.3d 1000, 1018 (9th Cir. 2002) (quoting *Taylor v. Illinois*, 484 U.S. 400, 415 (1988)). In this case, however, even if we were to assume that exclusion was an abuse of discretion, any error would be harmless. In post-trial litigation, the full text of the relevant message was disclosed, and the district court correctly held that that it was inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Thus, even

if the message had not been excluded on discovery grounds, it would not have been admissible evidence.[10]

Finally, Lindsay argues that the district court abused its discretion by preventing him from asking questions about a scheme by S.Q.'s father to extort S.Q.'s mother and grandmother. However, all of the excluded testimony would have concerned whether or not S.Q.'s father asked for 500,000 pesos at the Philippine courthouse. As the district court recognized, whether or not this fact was true was collateral to the relevant issues in the case: the chain of inferences from the proposed testimony to the relevant issues required the jury to believe that (1) the ask for money occurred, (2) the ask for money was part of a scheme by S.Q.'s father's to extort the Del Pilars, (3) S.Q.'s father's extortion reflected negatively on S.Q.'s credibility, and (4) S.Q. therefore should not be believed when she testified that she and Lindsay had sex. The district court did not abuse its discretion by preventing this testimony, given the remote chain of inferences and given that Lindsay was otherwise able to attack S.Q.'s credibility and to argue that he was the victim of an extortion scheme.

3.

Finally, we also reject Lindsay's argument that the district court abused its discretion by admitting evidence that he had sex with other teenage girls in the Philippines. Lindsay argues that the evidence was inadmissible under

---

[10] Lindsay argues on appeal that the exclusion was also overbroad because he might have used it for other purposes, such as to refresh S.Q.'s boyfriend's recollection, but he did not argue at that time that the district court's exclusion was overbroad for that reason, and he has not demonstrated that the district court's decision constituted plain error. *See Depue*, 912 F.3d at 1234.

Evidence Rule 404(b), but that rule operates only to exclude the propensity inference that can be drawn from evidence of other bad acts. *See* Fed. R. Evid. 404(b)(1). When certain evidence may allow the jury to draw a propensity inference, but may also allow the jury to evaluate a legitimate purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," the mere fact of the potential propensity inference does not render the evidence inadmissible. *See* Fed. R. Evid. 404(b)(2).

That is the case here. While there was a strong propensity inference that could have been drawn from the instant messages, the messages were not admissible or admitted for that purpose. Instead the district court admitted the messages to show the purpose of the list in Lindsay's notebook, which made it more likely that Lindsay had sex with S.Q. In other words, the messages did not show that Lindsay must have had sex with S.Q. because he is the sort of person who has sex with teenage girls; they showed that Lindsay was more likely to have had sex with S.Q. because her name appeared on a list of girls, at least some of with whom Lindsay had sex. Such evidence is not prohibited by Rule 404(b) because it does not "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

Lindsay's stronger argument is that, even if the evidence was not introduced solely for the propensity inference, the prejudice from that inference and the possible negative emotional reaction of the jury to it was so great as to make the evidence "substantially outweighed by a danger of . . . unfair prejudice." *See* Fed. R. Evid. 403. There is no question that Lindsay is correct on the evidence's prejudice. However, the district court recognized that the evidence was

prejudicial and nonetheless decided that the probative value justified admission. "The district court is to be given 'wide latitude' when it balances the prejudicial effect of proffered evidence against its probative value," *United States v. Higuera-Llamos*, 574 F.3d 1206, 1209 (9th Cir. 2009) (quoting *United States v. Spencer*, 1 F.3d 742, 744 (9th Cir. 1993)), and we hold that the district court's admission of the evidence was not so unreasonable as to constitute an abuse of discretion.

We therefore hold that there was no abuse of discretion or constitutional error in the district court's evidentiary rulings.

## D.

Lindsay last argues that, even if none of the errors individually require us to vacate his conviction, the cumulative effect of the errors denied him a fair trial. We reject this argument. Cumulative error applies only when multiple errors exist such that our review of them would be better served by examining the prejudice collectively, rather than through "a balkanized, issue-by-issue harmless error review." *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988). There were not multiple errors here and therefore there cannot be cumulative error. *See United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007) ("[B]ecause we hold that there was no error committed by the district court, Jeremiah's theory of cumulative error necessarily fails").

We therefore affirm Lindsay's conviction.

IV.

We next address the United States's cross-appeal, concerning Lindsay's sentence. The United States's sole argument on cross-appeal is that Lindsay's sentence should be set aside because the district court miscalculated Lindsay's Guidelines range before imposing the sentence.

Although the United States Sentencing Guidelines are no longer binding, they must be correctly calculated; it is procedural error for a district court to calculate the Guidelines range incorrectly. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). The United States argues that the district court miscalculated Lindsay's Guidelines range because it failed to apply a two-level obstruction of justice enhancement, USSG § 3C1.1. According to the United States, Lindsay's base offense level of 31 should have been 33, which would have increased the Guidelines range from 108–135 months to 135–168 months. *See* USSG Ch. 5, Pt. A.

We conclude that the district court erred by failing to apply the enhancement. There is no dispute that section 3C1.1 applied in this case because Lindsay committed obstructive conduct within the meaning of the section. Instead, the district court declined to apply the enhancement because doing so would have been to "count it twice." Lindsay defends this reasoning on appeal, arguing that applying the obstruction enhancement would have impermissibly "double-counted" his obstructive conduct at sentencing. But double-counting was not at issue in Lindsay's sentence; the Guidelines contemplate that if a defendant is convicted of both an obstruction offense and an underlying offense, the counts will be grouped, and "[t]he offense level for that group of closely related counts will be the offense level for the underlying offense increased by the

2-level adjustment . . . or the offense level for the obstruction offense, whichever is greater." USSG. § 3C1.1 cmt. 8. By ignoring this comment and imposing concurrent sentences, the district court never accounted for Lindsay's obstructive conduct in his sentence as the Guidelines contemplate.

Lindsay argues that, even if this is true, it is solely because the district court separately grouped the sex offence counts and the obstruction counts, which the United States affirmatively agreed to. We agree that the United States waived any challenge to the separate grouping, and that its argument would fail if the grouping was determinative of the enhancement issue. However, whether the counts should have been grouped or not does not affect whether the obstruction enhancement should have applied to the sex offense counts. The plain text of section 3C1.1 instructs sentencing courts to increase the offense level whenever the defendant has "willfully obstructed or impeded . . . the administration of justice." USSG § 3C1.1. This increase is mandatory; the district court did not have discretion to ignore it. *United States v. Ancheta*, 38 F.3d 1114, 1118 (9th Cir. 1994). Thus, regardless whether the counts were grouped or not, the district court should have applied the obstruction enhancement to Lindsay's total offense level. By failing to do so, the district court committed procedural error. *See Carty*, 520 F.3d at 993.

Nor can we say that the error was harmless. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 & n.5 (9th Cir. 2011). After incorrectly calculating Lindsay's Guidelines range as 108–135 months, the district court sentenced Lindsay to a term of 96 months. While the district court explained the reasons for that variance, "[t]he court must explain, among other things, the reason for the *extent* of a variance." *Id.* at 1031 (emphasis in original). "The

extent necessarily is different when the range is different, so a one-size-fits-all explanation ordinarily does not suffice," and we "are not convinced that the district court would impose the same sentence if the correct Guidelines range was 'kept in mind throughout the process.'" *Id.* (quoting *Carty*, 520 F.3d at 991). Remand for resentencing is therefore required. We do not opine on the appropriateness of any ultimate sentence, but leave that issue in the district court's capable hands.

Therefore, while we affirm Lindsay's conviction, we vacate his sentence and remand for resentencing.

**AFFIRMED in part, VACATED in part, and REMANDED.**