**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

No. 22-50024

D.C. No.
2:07-cr-00168-
DSF-1

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted June 27, 2023
Pasadena, California

Filed August 28, 2023

Before: N. Randy Smith, Kenneth K. Lee, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge VanDyke

# SUMMARY[*]

## Criminal Law

The panel affirmed Michael Pepe's jury conviction on two counts of violating 18 U.S.C. § 2423(b) by traveling in foreign commerce with the purpose of committing illicit sexual acts and two counts of violating 18 U.S.C. § 2241(c) by crossing a state line to sexually abuse a child under 12 and then so doing.

Pepe contended that no rational finder of fact could have found beyond a reasonable doubt that he violated §§ 2423(b) and 2241(c). He argued that the Supreme Court in *Mortensen v. United States*, 322 U.S. 369 (1944), ruled categorically that a jury cannot rationally find that a defendant who leaves his home for an innocent purpose on a round trip returns for a criminal purpose. Declining Pepe's invitation to expand *Mortensen* beyond its rationale and facts, the panel wrote that *Mortensen* does not remove from the jury's province its ability to rationally find that a person embarked on a trip with an innocent purpose but returned home with a motivating purpose of illicit conduct. The panel held that a jury could rationally find that the sexual abuse of children was one of Pepe's primary motivations for returning from the United States to Cambodia, which is sufficient to uphold his convictions under § 2423(b) (Counts 1 and 2). Noting that § 2241(c) (Counts 3 and 4) requires the jury to find a slightly more specific motivating purpose, the panel held that a rational trier of fact could have found that Pepe's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

charged victims were, in fact, under 12, and that Pepe crossed state lines with a motivating purpose of sexually abusing girls under 12.

Because *Mortensen* does not preclude the government's theory of the case, and Ninth Circuit precedent clearly establishes that a defendant can have mixed motives for traveling, the panel held that the district court did not err in declining to instruct the jury on Pepe's innocent round trip theory of defense.

The panel also held that the district court did not err in its instructions to the jury on the requisite mens rea. The panel wrote that Congress's 2018 amendment of § 2423(b) is not clearly irreconcilable with this court's precedent upholding a "motivating purpose" as sufficient for conviction, the district court did not abuse its discretion in declining Pepe's request to add a requirement that the government prove that the criminal sexual activity was "not merely incidental," and the district court properly declined to instruct the jury that the improper conduct must be a but-for cause of the travel.

## COUNSEL

James H. Locklin (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Defendant-Appellant.

Elana Shavit Artson (argued), Stephanie S. Christensen, and Damaris Diaz, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Criminal Appeals

Section Chief; E. Martin Estrada, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

VANDYKE, Circuit Judge:

Michael Pepe moved from the United States to Cambodia in the spring of 2003. Between June 2005 and June 2006, he sexually abused young girls, eight of whom eventually testified against him at trial. The government presented evidence at trial from which a jury could infer that one of Pepe's primary activities in Cambodia was molesting children. A jury convicted Pepe of two counts of violating 18 U.S.C. § 2423(b) by traveling in foreign commerce with the purpose of committing illicit sexual acts and two counts of violating 18 U.S.C. § 2241(c) by crossing a state line with intent to sexually abuse a child under 12 and then so doing. Pepe appeals the sufficiency of the evidence for each of these convictions, as well as the district court's instructions to the jury. Because the evidence was sufficient for the jury to rationally find beyond a reasonable doubt that Pepe was guilty on all counts and the district court did not err or abuse its discretion in instructing the jury, we affirm.

# BACKGROUND

## I. Factual Background[1]

Pepe is a citizen of the United States. In March 2003, when he was nearly fifty, Pepe moved to Phnom Penh, Cambodia. Pepe told his sister that Cambodia "was a very dysfunctional country" and that "it was like the wild, wild west there; … there weren't any rules." "He was not very complimentary about [the Cambodian people]. He thought that they were a lower class of citizen, that all the police were corrupt, and that all the ordinary people were peasants who lived in huts with dirt floors."

Sometime after Pepe arrived in Cambodia but before May 2004, Pepe hired a woman known as Basang as a prostitute.[2] Basang later procured children for Pepe to sexually abuse and taught at least some of the children how to behave when being abused by Pepe. Soon after his May 2005 travel, Pepe received a letter from a pen pal called "Mack," thanking Pepe for loaning Mack money. Pepe would later thank Mack for sending Pepe an "email with pictures," an email that "help[ed Pepe] make up [his] mind to continue to stay … longer."

---

[1] Because Pepe appeals the sufficiency of the evidence after his conviction by a jury, we consider the facts in the light most favorable to the government. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

[2] Although the date of their first meeting is unclear, Basang knew, at the time of her deposition, about Pepe's living arrangements prior to his May 2004 move. A jury could rationally infer from her knowledge of his pre-May 2004 living arrangements and the fact that Pepe hired her as a prostitute that Basang had visited Pepe's house before his move in May 2004.

On May 26, 2005, Pepe returned to his Cambodian residence from a trip to the United States. Two weeks later, Basang brought N.P., a young Cambodian girl, to Pepe's house where Pepe raped her and, over the span of at least 13 days, took 67 photos of her, including nude photos.[3] N.P. was the first of eight girls whom Pepe sexually abused and who ultimately testified at his trial.

On or before August 6, 2005, Basang brought K.S. to Pepe's house. Photos were taken of K.S. at Pepe's house with Pepe's camera on August 6, 2005. Pepe admitted to taking nude photos of two of Basang's "nieces" and acknowledges in his briefing that K.S. was one of Basang's nieces. K.S. testified that she stayed in Pepe's house for "several months." Pepe raped K.S., leading her to be hospitalized for a week.

On September 3, 2005, Pepe returned to Cambodia from a trip to the United States. In late October or early November, Basang brought L.K. to Pepe's house, where she remained for "[a]bout eight months" until the Cambodian police searched the home in June 2006. Pepe took photos of L.K. and, between November 2005 and June 2006, his camera captured 493 photos of L.K. Pepe persisted in "raping [L.K.] the entire time that [she] lived at his house." L.K. testified that Pepe raped her once a week, "sometime[s] every day or once every two weeks."

Pepe's photos of S.R., yet another girl, date from as early as November 26, 2005, although, as is true for perhaps all of the girls, the evidence does not precisely establish the date

---

[3] The jury found, and Pepe does not dispute for purposes of this appeal, that he sexually abused the young girls. The details of Pepe's abuse are disturbing, and are discussed in this opinion only as necessary.

when S.R. arrived at Pepe's house. S.R. testified that Pepe sexually abused her every night he was home during her time at his house. Pepe took photos of S.R. and the government found at least 315 photos of her taken from his camera. S.R.'s sister, S.S., arrived at Pepe's house by, at latest, December 4, 2005, the date of the first photo of her on Pepe's camera. The government recovered 278 photos of S.S. from Pepe's camera. S.S. testified that Pepe sexually abused her "frequently." Meanwhile, Basang taught S.S. to perform sexual acts with Pepe. Photos of S.S. and S.R. were taken at Pepe's house as late as June 11, 2006.

T.C. spent nearly a month at Pepe's house, and although the dates of her arrival and departure are unclear, photos of T.C. taken at Pepe's house span from February 14, 2006, to February 28, 2006. While T.C. was at his house, Pepe raped her four times.

N.T.D. arrived at Pepe's house during the Vietnamese lunar new year. N.T.D. testified that Pepe raped N.T.D. "[a]t least one time a day" during her time at Pepe's house, which was "[a]bout a week." She also testified that Pepe brought in another girl—unidentified here—and sexually abused her. At least a dozen photos of N.T.D. were taken at Pepe's house on April 17, 2006.

I.T. could not recall when Basang brought her to Pepe's house, but photos of I.T. were taken with Pepe's camera between April 21, 2006, and May 20, 2006. Pepe raped I.T. multiple times. Basang eventually took I.T. back home. When she returned home, I.T. told her grandmother about pain she was suffering and I.T. later led "the police to [Pepe's] house."

The Cambodian police, along with a United States agent observer, arrested Pepe in June 2006. When searching

Pepe's home, the police found condoms, drugs, KY jelly, baby oil, rope, and "strips of cloth that were tied together." The drugs included Viagra and drugs that, according to an expert, could be used to sedate a child. The police also found a bedroom close to Pepe's bedroom that had stuffed animals, children's bedding, and children's clothes. In the space between the children's room and Pepe's room, there was a massage table and photos of Pepe's victims. The police found digital storage devices that contained more than a thousand photos, including the photos of the victims discussed above. Among other items, the police also found cuttings of newspaper articles discussing pedophiles in Cambodia. Soon after the police searched Pepe's house and arrested him, Dr. Laura Watson, who at that time "work[ed] at an International Clinic in Phnom Penh, Cambodia," examined some of Pepe's victims on June 20, 2006. She then reexamined those same victims, as well as several additional victims she hadn't examined before, a year later in June 2007.

## II. Procedural Background

Pepe was initially tried and convicted of violating 18 U.S.C. § 2423(c). That conviction was vacated on appeal. *See United States v. Pepe*, 895 F.3d 679, 682 (9th Cir. 2018). On remand, a grand jury charged Pepe with two counts of violating § 2423(b) and two counts of violating § 2241(c). Counts 1 and 2, arising under § 2423(b), charged Pepe with knowingly traveling in foreign commerce "for the purpose of engaging in illicit sexual conduct." The two counts differed from each other only in the dates of the charged travel: Count 1 related to travel in May 2005, and Count 2 related to travel in September 2005.

Counts 3 and 4 charged Pepe with violating § 2241(c). Count 3 charged Pepe with knowingly crossing a state line in May 2005 "with the intent to engage in a sexual act … with a person who had not attained the age of 12 years, and engag[ing] in a sexual act … with K.S., who had not attained the age of 12 years" when Pepe "engaged in a sexual act with her." Count 4 differed only in the time of the travel (August–September 2005) and the victims, which were S.S., S.R., and I.T., "each of whom had not attained the age of 12 years at the time that defendant [Pepe] engaged in a sexual act with that person."[4]

At the end of the trial, over Pepe's objections to the instructions' phrasing, the court instructed the jury regarding the two statutes' mens rea requirements. Pepe also requested that the court instruct the jury on his theory of defense— namely, that he could not have a criminal intent in returning to Cambodia if his return trip was part of a round trip journey with an "innocent" beginning (i.e., the outgoing leg of the trip was taken for a purpose unrelated to his illicit sexual activity). The court declined to give that instruction and the court later, after the jury returned its guilty verdict, denied Pepe's post-trial motion for acquittal. Pepe now appeals the district court's order denying his motion for acquittal, the district court's jury instructions, and the jury verdict.

## DISCUSSION

Pepe contends that there was insufficient evidence for his convictions under 18 U.S.C. §§ 2423(b) and 2241(c) on the theory that no rational factfinder could have found beyond a

---

[4] The government's theory, as stated in the indictment, was that Pepe "knowingly crossed a California state line while traveling from New Mexico to Cambodia through Los Angeles, California."

reasonable doubt that he traveled to Cambodia with the intent to sexually abuse children.  Although Pepe supplies reasons that a factfinder could have found in his favor, he falls short of showing that no reasonable factfinder *could have* found he had the requisite intent.  Pepe also contends that the district court erred in instructing the jury but fails to show any error or abuse of discretion.  We affirm Pepe's conviction and the district court's order denying acquittal.

## I.   A Rational Trier of Fact Could Have Found Beyond a Reasonable Doubt that Pepe Committed the Charged Crimes.

Pepe challenges the sufficiency of the evidence, "which requires a court of appeals to determine whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The "reviewing court may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal."  *Id.* at 1164.

A person violates § 2423(b), as it was written at the time of Pepe's conduct, when that person "travels in foreign commerce[] for the purpose of engaging in any illicit sexual conduct with another person."    18 U.S.C. § 2423(b) (effective April 30, 2003).   According to Ninth Circuit precedent, a person violates § 2241(c), as it was written at the time of Pepe's conduct, when that person "crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years" and "knowingly engages in a sexual act with another person who has not attained the age of 12 years."  18 U.S.C. § 2241(c) (effective

October 30, 1998); *see United States v. Lukashov*, 694 F.3d 1107, 1121 (9th Cir. 2012) (construing these two clauses as elements of a conviction instead of independent means of violating the statute).

For both statutes, the government must prove that the improper purpose was a "dominant, significant, or motivating purpose" of the defendant's travel. *Lukashov*, 694 F.3d at 1118–19 (discussing § 2241(c)); *United States v. Lindsay*, 931 F.3d 852, 864 (9th Cir. 2019) (discussing § 2423(b)); *see also United States v. Flucas*, 22 F.4th 1149, 1156–57 (9th Cir.) (noting that although the court in *Lindsay* reviewed the district court for plain error, the court "found none"), *cert. denied*, 143 S. Ct. 320 (2022). The government need not prove that the improper purpose was a "but-for" cause of the travel. *See Lindsay*, 931 F.3d at 864. Instead, the improper purpose can be one of several reasons that the defendant traveled. *See id.* (noting the "human ability and propensity to act in light of multiple motives and purposes" (quoting *Lukashov*, 694 F.3d at 1118)).

Pepe contends that no rational finder of fact could have found beyond a reasonable doubt that he violated 18 U.S.C. §§ 2423(b) and 2241(c). He first argues that the Supreme Court in *Mortensen v. United States* ruled categorically that a jury cannot rationally find that a defendant who leaves his home for an innocent purpose on a round trip returns for a criminal purpose. 322 U.S. 369 (1944). He then proceeds to argue that, even if *Mortensen* did not reach so far, no rational factfinder could have found in this case that he traveled back to Cambodia with the purpose of engaging in illicit sexual acts, that he traveled back to Cambodia with the purpose of sexually abusing children under 12, or that his victims were, in fact, under 12. Pepe's arguments fail. He

overreads *Mortensen*, and the evidence is sufficient to sustain each of Pepe's convictions.

### A. *Mortensen v. United States* Does Not Disturb the Ordinary Rule of Deferring to the Jury's Rational Findings.

Pepe's first and central argument is that the Supreme Court's decision in *Mortensen v. United States* holds that a rational jury *cannot* find that a defendant who leaves his residence on a round trip for an innocent purpose returns for a criminal purpose. 322 U.S. at 369. Given that categorical reading of *Mortensen*, Pepe thus contends that the jury here could not rationally find him guilty because there is no dispute that Pepe's two trips *to* the United States were for innocent purposes. But the Court in *Mortensen* did not purport to work such a departure from the bedrock principle that courts defer to the rational findings of the jury when reviewing the sufficiency of the evidence. *See Abrams v. United States*, 250 U.S. 616, 619 (1919). The Court instead issued a narrow decision that determined, "under the circumstances of [that] case," that the evidence was not sufficient for a jury to find that the defendants transported two prostitutes interstate for an illicit purpose. *Mortensen*, 322 U.S. at 375.

In *Mortensen*, the Supreme Court reversed the conviction of a married couple who "operated a house of prostitution" in Nebraska and took two of their employee prostitutes on a vacation with them to Utah. *Id.* at 372. A jury had convicted the couple of violating section 2 of the Mann Act, which prohibits a person from knowingly transporting in interstate commerce "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose." *Id.* at 373–74 (quoting Mann Act, ch.

395, § 2, 36 Stat. 825 (1910)).  The Court explained that for the jury to rationally find the Mortensens were guilty, "[a]n intention that the women or girls shall engage in the [unlawful conduct] … must be found to exist before the conclusion of the interstate journey and must be the dominant motive for such interstate movement." *Id.* at 374.

The Court ruled that in the unique circumstances of that case, a rational jury could not have found such an intention beyond a reasonable doubt.  *Id.*  The Mortensens had undertaken to give their two employee prostitutes a vacation, an innocent purpose for their travel *to* Utah.  *See id.* at 375. Although the women "resumed their immoral practices after their return to [Nebraska]," that fact, "standing alone, [did not] operate to inject a retroactive illegal purpose into the return trip to [Nebraska]." *Id.*  Critical to the Court's reasoning was that, "*under the circumstances of [that] case*," there was an "integral relation" between the return journey and the "innocent round trip as a whole" that precluded severing the purpose of the outbound journey from the return journey.  *Id.* (emphasis added).  The Court thus concluded that, because the Mortensens had an innocent purpose for bringing the prostitutes *to* Utah, they could not have had an illicit purpose in returning the prostitutes to Nebraska.  *See id.* at 375–76.

The Court repeatedly emphasized the fact-bound nature of its decision.  *See, e.g.*, *id.* at 374 (stating that the Court's "examination of the record in this case" indicated that the conviction could not be upheld); *id.* at 375 (explaining the conviction could not be upheld "under the evidence adduced").  And the critical circumstances in *Mortensen*, those that gave rise to the "integral relation" between the outbound journey and return journey, are not present in this case.  Specifically, the Mortensens had been charged with

transporting *other people* with illicit intent; Pepe was convicted of traveling—or transporting *himself*—with illicit intent.     Accordingly, because the relevant inquiry in *Mortensen* was into the defendants' motives for transporting *someone else*, the "return journey" could not be "considered apart from its *integral relation* with the innocent round trip as a whole."  *Id.* (emphasis added).  After all, a person who undertakes responsibility for another's round trip transportation on a vacation is likely to have the same motive for taking that other person *to* the vacation destination as his motive for taking that other person home—namely, that the person desires the other person to take the vacation.  *Cf.*, *e.g.*, *id.* at 372 (noting that the Mortensens took their employees on a vacation at the employees' request).  There is thus an "integral relation" between the provider of transportation's motive in providing the outbound transportation and that provider's motivation in providing the return transportation. *Id.* at 375.

But in this case, Pepe did not transport anyone else.  He transported himself.  A person's motives for embarking on his own round trip are not so tied to his motives for his return trip that a jury could not rationally find that one of the person's motivating purposes for returning is to resume illegal activity.  As many would recognize from common experience, a person coming to the close of his vacation may depart for home because of some mix of family obligations, work, and hobbies—purposes that necessarily differ from those that prompted the traveler to embark on his trip.  The facts that gave rise to the "integral relation" between the outbound and return journeys in *Mortensen* are thus not present in Pepe's case.

Pepe reads *Mortensen* to preclude a jury from rationally finding a person guilty of returning home with an illicit

purpose when that person undertook the outbound travel for an innocent purpose.  He thus invites us to extend *Mortensen* beyond its facts and rationale.  But the Court in *Mortensen* went out of its way to confine its reasoning to the facts of that case, explaining that it "would normally be precluded from reviewing or disturbing the inferences of fact drawn from the evidence by the jury," *id.* at 374; *see also, e.g.*, *id.* (noting the "examination of the record *in this case*" shows "a complete lack of relevant evidence" (emphasis added)).  We take the Court at its word.  Pepe's proposed reading of *Mortensen* would also be in tension with our own precedent, which establishes that *Mortensen* does not preclude a jury from finding that a person traveled with more than one motive, *see Flucas*, 22 F.4th at 1160 (interpreting *Mortensen* as "requiring that criminal sexual activity be one of the several motives or purposes" (approvingly quoting *United States v. Ellis*, 935 F.2d 385, 389–90 (1st Cir. 1991))), and which rejects the proposition that a jury must find that a motivation to commit illicit sexual acts were a "but-for" cause of the travel, *see Lindsay*, 931 F.3d at 864.

We thus decline Pepe's invitation to expand *Mortensen* beyond its rationale and facts.  *Mortensen* does not remove from the jury's province its ability to rationally find that a person embarked on a trip with an innocent purpose but returned home with a motivating purpose of illicit conduct.[5]

---

[5] Even if we were to construe *Mortensen* as establishing a categorical legal rule about the scope of liability for someone transporting someone else with unlawful intent, that categorical rule would not apply to Pepe. That categorical rule would work only to preclude a finding of unlawful intent when a defendant transports another person somewhere for an innocent purpose and then returns that same person to the place of origin. *See Mortensen*, 322 U.S. at 374 (summarizing the issue in the case as whether the defendants could be found guilty of "transport[ing] the girls

Neither *Mortensen*, nor the cases Pepe cites that discuss or build on *Mortensen*, reach that far. *See Twitchell v. United States*, 330 F.2d 759, 761 (9th Cir. 1964); *Langford v. United States*, 178 F.2d 48, 51–52 (9th Cir. 1949).[6]

### B. A Jury Could Rationally Find that the Sexual Abuse of Children Was One of Pepe's Primary Motivations for Returning to Cambodia.

As relevant to each of Pepe's convictions, a jury could have rationally found that one of Pepe's primary motivations for returning to Cambodia was to sexually abuse young girls. Pepe had longstanding relationships with two people who helped or encouraged him to abuse children, he had a house set up to facilitate the sex abuse, and he remained in Cambodia—a country he knew had a poor reputation for stopping child sex abuse—despite speaking ill of the country generally.

A jury could rationally find from her knowledge of Pepe's pre-May 2004 living arrangements that Basang,

---

in interstate commerce 'for the purpose of prostitution or debauchery' within the meaning of the Mann Act").

[6] Pepe also relies on the Supreme Court's summary decisions following and invoking *Mortensen*. *Becker v. United States*, 348 U.S. 957 (1955) (mem.); *Oriolo v. United States*, 324 U.S. 824 (1945) (mem.). Although Pepe is correct that Supreme Court summary decisions are binding, their "precedential effect … extends no further than the precise issues presented and necessarily decided by those actions." *Green v. City of Tucson*, 340 F.3d 891, 902 (9th Cir. 2003) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 784–85 n.5 (1983)). Given the fact-bound nature of the *Mortensen* decision, the "precise issues presented and necessarily decided by those actions" would be just as fact-bound. *Id.* Relying on these summary affirmances would require us to improperly speculate about why the Court deemed *Mortensen* applicable to those cases.

Pepe's child broker, and Pepe knew each other for approximately a year before he returned from the United States to Cambodia in May 2005 with the charged purpose of abusing children. And Basang not only procured children for Pepe to sexually abuse, she trained the children how to behave during the abuse. A jury could also find that prior to Pepe's May 2005 travel, Pepe also knew a man named Mack who was involved in child sexual abuse. The government introduced a letter from Mack to Pepe dated June 7, 2005—just a couple of weeks after Pepe returned to Cambodia on May 26, 2005—thanking Pepe for lending Mack money. The jury could also infer from multiple calendar entries in August and October 2005 relating to Mack that the two had an ongoing friendship. In one email, Pepe thanked Mack for sending him "pictures" that "help[ed] [Pepe] to make up [his] mind to continue to stay [in Cambodia] longer." The next sentence in the email, in which Pepe told Mack that "[t]he sweet things I have with me have the most perfect little bodies and attitudes," strongly suggests that the photos Mack sent Pepe were child pornography.

The government also presented evidence that, when Pepe's house was raided in June 2006, it was substantially dedicated to abusing children. He had a room furnished and decorated specifically for children. Near this room was a massage table where he sexually abused his victims. The same raid revealed substantial sex paraphernalia and cuttings of newspaper articles regarding pedophiles. And the government introduced evidence that Pepe had developed rules for how his child victims were to behave when living in the house and that he had written out a "menu" of his sexual preferences. The government further introduced evidence of more than a thousand photos of children taken on Pepe's camera, including nude photos. And the

government introduced evidence of how the photos were carefully organized on Pepe's hard drive and in labeled CDs.

The jury could also rationally infer that Pepe specifically chose to return to Cambodia after his visits to the United States because it would allow him to continue to sexually abuse children. A tourist map for Phnom Penh, Cambodia, obtained from Pepe's house warned in the English language, "Sex with children is a crime." The jury could rationally infer from that *tourist map* warning that English-speaking tourists coming to Cambodia to have sex with children was unfortunately common. Basang and one of Pepe's child victims testified to the ubiquity of child sex slavery in Cambodia. Pepe himself acknowledged the prevalence of the "sex industry in Cambodia," and noted it was "particularly true as regards to younger people."

Not only could a jury rationally infer that Pepe was aware that returning to Cambodia would allow him to continue sexually abusing children, but a jury could rationally infer that it was a primary reason for his return. Pepe told his sister that Cambodia "was a very dysfunctional country" and that "it was like the wild, wild west there; … there weren't any rules." As for the people, his sister testified that "[h]e was not very complimentary about them. He thought that they were a lower class of citizen, that all the police were corrupt, and that all the ordinary people were peasants who lived in huts with dirt floors." Pepe contends that the jury should not have credited such testimony, coming from his estranged sister, that he criticized the Cambodian culture and people. But the jury was entitled to find her credible. *See Nevils*, 598 F.3d at 1170.

Pepe disagrees with this characterization of his life in Cambodia, contending that "the evidence established that he

engaged in a variety of activities completely unrelated to sex." There is evidence that Pepe did not *solely* engage in child sex abuse during his time in Cambodia. But he does not point to evidence of activities so substantial that the jury was required to find that the sexual abuse of children was only a small part of his life. *See id.* at 1169 (requiring the defendant to "point[] to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt"). The jury could rationally find that one of Pepe's primary motivations for returning to Cambodia was sexually abusing young girls, a finding directly relevant to the sufficiency of the evidence for each of his charged offenses.

### C. Counts 1 and 2: Sufficient Evidence Supports Pepe's Convictions Under 18 U.S.C. § 2423(b).

The United States charged Pepe in Counts 1 and 2 with violating § 2423(b) by traveling in foreign commerce with the purpose of engaging in illicit sexual conduct. Pepe contends that the jury could not have rationally found that his purpose in traveling back to Cambodia in either May or September 2005 was to sexually abuse children. He is incorrect.

### 1. Sufficient Evidence Supports the Conviction on Count 1.

The evidence was sufficient for a rational jury to find Pepe was guilty of traveling in foreign commerce on May 25 and 26, 2005, with the purpose of committing illicit sexual acts, as charged in Count 1. Along with the evidence discussed above demonstrating the pervasive role child sex abuse played in Pepe's life in Cambodia, the government presented evidence indicating that Pepe flew back to Cambodia after a trip to the United States on May 26, 2005,

and that, two weeks later, on June 9, 2005, he was sexually abusing N.P. Metadata on Pepe's camera reveals photos were taken of N.P. until June 22, 2005. This is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt, that the accused is guilty" of traveling to Cambodia in May 2005 with a motivating purpose of engaging in illicit sexual acts. *Id.* at 1165 (quoting *United States v. Nelson*, 419 F.2d 1237, 1242 (9th Cir. 1969)).

Pepe disagrees, contending that the lack of evidence of Pepe sexually abusing a child *before* his May 2005 travel means a jury could not rationally find that a motivating purpose of his return to Cambodia was to sexually abuse children. But a jury could rationally rely on evidence of what Pepe did *after* he returned to Cambodia to discern whether one of his motivating purposes for returning was to engage in that conduct. *See United States v. Green*, 554 F.2d 372, 375 (9th Cir. 1977) (upholding the jury's finding that a trip was "for the purpose of prostitution" and noting approvingly the parties' concession that intent may be proved by "the conduct of the parties both before and within a reasonable time after the transportation"). The jury was especially within its discretion to make such a finding given the other evidence of Pepe's activities in Cambodia. *See United States v. Ware*, 416 F.3d 1118, 1121 (9th Cir. 2005) (noting that the court reviews the sufficiency of the evidence "by considering the totality of the trial evidence"). Sufficient evidence supports the jury's conviction on Count 1.

## 2.  Sufficient Evidence Supports the Conviction on Count 2.

Sufficient evidence supports the jury's finding that Pepe was guilty of traveling in foreign commerce in September 2005, with the purpose of committing illicit sexual acts, as charged in Count 2.  Along with the evidence discussed above, demonstrating at a general level the pervasive role child sex abuse played in Pepe's life in Cambodia, the government presented specific evidence of Pepe's acts of sexual abuse leading up to and following his September 2005 travel.

As noted above, the metadata recovered from Pepe's camera reveals photos taken of N.P. for at least two weeks in June.  Pepe's August 2005 calendar included a "Party with Mack," Pepe's pedophile pen pal, and "Mack's birthday." K.S., one of Pepe's victims, lived in his house for "several months," and Pepe's camera took photos of her on August 6, 2005.  The jury could rationally infer that the "several months" that K.S. stayed at Pepe's house overlapped with August 6, 2005.  And whether those months preceded August 6 or followed it, the timeline strongly suggests that child sexual abuse was a routine fixture of Pepe's life at the time of his early September travel.

The government also presented evidence indicating that Pepe returned from the United States to Cambodia on September 3, 2005, and that, in early November 2005, began sexually abusing additional victims, starting with L.K.  The government further introduced evidence from which a jury could rationally find that Pepe sexually abused S.R. starting in late November 2005, abused S.S. starting in early December 2005, abused T.C. in February 2006, abused

N.T.D. in April 2006, and abused I.T. between April 21, 2006, and May 20, 2006.

This is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt, that the accused is guilty" of traveling to Cambodia in September with a motivating purpose of illicit sexual acts. *Nevils*, 598 F.3d at 1165 (quotation omitted).

### D. Counts 3 and 4: A Rational Trier of Fact Could Have Found that Pepe Violated 18 U.S.C. § 2241(c).

As established above, a jury could rationally find that a motivating purpose for Pepe's return trips to Cambodia was to engage in illicit sexual acts. That is sufficient to uphold his convictions under § 2423(b). Section 2241(c) requires the jury to find a slightly more specific motivating purpose: that one of Pepe's motivating purposes in crossing state lines while returning to Cambodia was to sexually abuse children under the age of 12. Section 2241(c) also requires that Pepe have sexually abused girls who were, in fact, under 12. To take those questions in reverse order, the evidence is sufficient for a rational jury to find both that the charged victims were under 12 and that Pepe traveled with a motivating purpose of abusing children under 12.

### 1. A Rational Finder of Fact Could Have Found that Pepe's Charged Victims Were, in Fact, Under 12.

To convict under § 2241(c), Ninth Circuit precedent requires that the government prove that the defendant sexually abused a person who was, in fact, under 12. *See Lukashov*, 694 F.3d at 1121. Count 3 charged Pepe with sexually abusing K.S. and Count 4 charged Pepe with

sexually abusing I.T., S.S., and S.R., all of whom were under the age of 12. The jury found that Pepe was guilty of both counts. Testimony from the victims, records, and the testimony of Dr. Watson—who examined at least some of the victims in June of 2006 and 2007—all support the jury's findings.

### a. K.S.

K.S. testified that Pepe raped her while she was at his house for "several months," months overlapping with August 6, 2005. The government introduced photos of K.S. taken on that date into evidence, and she appears to be a young child. K.S. testified that although she "did not [originally] know [her] birth date, … [an] organization[] found [her] family book and that's when they found out that [she] was born" in August 1994. The family book was also entered into evidence. This is sufficient evidence from which a jury could rationally find that K.S. was under 12 years of age when she was at Pepe's home, the place where she was sexually abused.

Pepe's arguments to the contrary are unavailing. Pepe points out that K.S. had told U.S. agents in September 2006 that she was 13—which would have placed her birthday in 1993, not 1994. But she testified that she "kind of guessed" when she gave her age to the agents. Pepe claims that K.S. told an examining physician that she had a 1993 birthdate, but that allegation conflicts with the family book and K.S.'s later testimony that her birthday was in August 1994, and the jury was entitled to rationally resolve the conflict in favor of the government.

Pepe also challenges the reliability of the family book because K.S. could not interpret it and because a U.S. official stated that its "accuracy is unknown." Given that K.S. also

testified that she was not literate in Khmer and the family book was in Khmer, her inability to interpret the book does not undermine its reliability.  True, a U.S. agent applying for a visa on behalf of K.S. before her family book was located noted that if the book exists and were obtained, its "accuracy is unknown."  But the jury need not view this statement as evidence that the family book was inaccurate—instead, the jury was entitled to interpret this statement as meaning only that the officer did not know whether the family book would be accurate *if found*, just as any cautious person might disclaim knowledge of the accuracy of a document that they do not possess.  *See Nevils*, 598 F.3d at 1164 (noting that a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any [conflicting inferences] in favor of the prosecution" (quotation omitted)).  Pepe also points to a U.S. prosecutor's 2013 declaration stating that K.S. "was approximately 11 to 12 years old" "[a]t the time of the crimes charged."  Of course, that is not necessarily inconsistent with K.S. being under 12 years old when sexually abused.  The government presented the jury with sufficient evidence for it to rationally find that K.S. was under 12 at the time Pepe abused her.

### b.  S.R. and S.S.

Testimony and metadata from Pepe's camera indicate that Pepe sexually abused S.R. and S.S. in December 2005. The government introduced family books indicating that S.R. and S.S. were 9 and 10 years of age in December 2005. The two girls testified to the same.  Pepe contends that this evidence is insufficient because the family book and the girls' testimony give different specific dates of birth.  But that inconsistency is immaterial.  The family book and the testimony agree that the two girls were 9 and 10 at the time

they were abused. The jury could rationally find based on these two sources of evidence that S.R. and S.S. were under 12 years of age when Pepe molested them.

### c. I.T.

Testimony and metadata from Pepe's camera indicate that Pepe sexually abused I.T. between April 21, 2006, and May 20, 2006. I.T. testified that she was born in the last quarter of the 1994 calendar year, which would have made her 11 when Pepe raped her. Consistent with this birthday, I.T. testified at Pepe's trial in August 2021 that she was 26 years old. Further, Dr. Watson testified that in June 2006, I.T. had not yet begun menstruating and had only begun the "very, very early stages of puberty." A year later, in June 2007, Dr. Watson examined I.T. a second time and I.T. still had not had her first period and she had not "advanced through puberty"—"there weren't any changes." The jury could thus infer from both Dr. Watson's and I.T.'s testimony that I.T. was under 12 years of age when Pepe abused her.

Pepe argues that a jury could not rationally find that I.T. was under 12 when Pepe abused her because, prior to testifying that she was born in a month falling in the last quarter of 1994, she had testified that she was born early in the 1994 calendar year. But given the presumption that the jury resolved any conflicts in the evidence in favor of the government, sufficient evidence supports the jury's finding that I.T. was under 12 at the time of the abuse. *See Nevils*, 598 F.3d at 1164 (citation omitted).

Pepe further argues there was insufficient evidence of I.T.'s age because Dr. Watson noted in her June 2006 report that I.T. was 12 and that I.T.'s "pubertal stage [was] consistent with stated age of 12." But Dr. Watson explained in her testimony that the note of I.T.'s age was based, not on

a precise birthdate, but on the Zodiac year of I.T.'s birth. And because the Zodiac year begins on April 13, if I.T. was born later in the year—such as the birthday I.T. testified to—then she would have been only 11 at the time of the examination. As for the report's note that I.T.'s "pubertal stage" was consistent with the age of 12, Dr. Watson confirmed in her testimony that "when [she was] examining [the victims]," she was not "trying to determine their precise age." The jury had sufficient evidence to rationally find that the charged victims were under 12 at the time of abuse.

### 2. A Rational Trier of Fact Could Have Found that Pepe Crossed State Lines with a Motivating Purpose of Sexually Abusing Girls Under 12.

Finally, to convict Pepe of violating § 2241(c), the jury must have found that a motivating purpose of his travel in May and September of 2005 was to sexually abuse children under the age of 12. *See Lukashov*, 694 F.3d at 1121. As discussed above, the government presented sufficient evidence for a jury to find that Pepe traveled with a motivating purpose of sexually abusing children. Combining that evidence with additional evidence indicating that Pepe particularly preferred prepubescent girls, a jury could rationally find beyond a reasonable doubt that Pepe traveled in May and September 2005 with a motivating purpose of sexually abusing girls under the age of 12.

The evidence shows that Pepe preferred prepubescent girls. Pepe handwrote a "Cambo Menu," presumably meaning "Cambodian Menu." That "menu" included phrases such as "shy little bbs girls bald p[***]y," "pedo nudes," "10 yo lolita kid pedo," "8–12 years lolitas sex pix,"

"preteen c[**]t," and "cartoons 3d pedo." The government also presented evidence that Pepe furnished a room with décor specifically suited for young girls. As discussed above, many of Pepe's victims were under 12. And a jury could rationally infer that the youth of these victims was not an accident. S.R., who was nine when she was at Pepe's house, explained that she had been "talked to" and she "was going to lose [her] virginity" a year later and her sister was going to "lose [her] virginity … in the next three months." It was S.R.'s understanding that Pepe "was waiting" because she "was too little." A jury could rationally infer that Pepe wanted to rape young girls at the earliest opportunity that their physiology would allow.

Pepe argues that the jury could not rationally find that he intended to sexually abuse girls younger than 12 years old because some of the girls that he molested following his return trips were 12 years or older. As for his May return trip, Pepe notes that N.P. was over 12 but cites evidence indicating only that N.P. might have been younger than 16. Regardless, the government introduced photos of N.P., taken during the time of the abuse following his May 2005 trip, and she looked very young. Further, as discussed above, a jury could rationally find that K.S., whom Pepe abused in the months following his May 2005 trip, was under 12. As for his September return trip, Pepe abused multiple girls following his trip who the jury could rationally find were under 12 at the time of abuse. This argument fails.

Pepe also argues that his sexual involvement with two adult women shows that he merely "liked skinny girls" and wasn't specifically targeting girls under the age of 12. Not so. Even if it is true that Pepe "liked skinny girls," that is obviously not inconsistent with the jury rationally finding

that he specifically targeted young girls because, among other things, they satisfied his "skinny" fetish.

The jury could rationally find beyond a reasonable doubt that when Pepe traveled in May and September of 2005, he did so with at least one motivating purpose of sexually abusing children under 12.

## II. Pepe Fails to Show Abuse of Discretion or Error in the District Court's Jury Instructions.

Pepe argues that the district court erred in not instructing the jury on his innocent round trip theory of defense and that the district court erred in its instructions to the jury on the requisite mens rea. The court reviews "the formulation of jury instructions for abuse of discretion, but review[s] de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Koziol*, 993 F.3d 1160, 1179 (9th Cir. 2021) (quoting *United States v. Liew*, 856 F.3d 585, 595–96 (9th Cir. 2017)). Neither of Pepe's challenges succeed.

### A. The District Court Did Not Abuse Its Discretion or Err in Declining to Give Pepe's Requested Defense Theory Instruction.

Pepe requested that the district court give the following instruction to the jury:

> One who takes an innocent round trip—that is, leaves his residence to travel elsewhere for purposes unrelated to criminal sexual activity and then returns to his residence—does not travel with the purpose of engaging in illicit sexual conduct (as required for Counts 1 and

2) or the intent to engage in a sexual act with a person who was under the age of twelve years (as required for Counts 3 and 4), even if such conduct occurred at that residence before the trip and resumed after the trip.

Pepe offered three alternative instructions that were substantially the same. The district court declined to give any of those instructions.

Pepe argues that the refusal to give the requested instruction to the jury was error. But Pepe's requested instruction would have instructed the jury that an innocent travel purpose precludes him from also having an illicit motive. Because *Mortensen* does not preclude the government's theory in this case, and Ninth Circuit precedent clearly establishes that a defendant can have mixed motives for traveling, *see Flucas*, 22 F.4th at 1155 (citation omitted), Pepe's requested instruction conflicted with the law and the district court did not err in declining to give it. *See United States v. Thomas*, 612 F.3d 1107, 1120 (9th Cir. 2010).

### B. The District Court Did Not Err or Abuse Its Discretion in Instructing the Jury on Mens Rea.

Over Pepe's objection, the district court gave the following instruction on the mens rea requirement for § 2423(b):

The government does not have to prove that defendant traveled in foreign commerce for the sole and exclusive purpose of engaging in illicit sexual conduct. A person may have different purposes or motives for travel and

> each may prompt in varying degrees the act
> of making the journey.  For Counts One and
> Two, the government must prove beyond a
> reasonable doubt that a dominant, significant,
> or motivating purpose of defendant's travel
> in foreign commerce was to engage in illicit
> sexual conduct.

The court gave a materially identical instruction on the intent requirement for § 2241(c), replacing "traveled in foreign commerce" for "crossed a state line" and "illicit sexual conduct" for "a sexual act with a person who was under the age of twelve years."  Pepe raises three issues with the instruction, but he fails to show that the instruction was an error or abuse of discretion.

First, Pepe argues that the instruction should have required the jury to find that his "sole or dominant purpose" for returning to Cambodia was to engage in illicit sexual activities, instead of requiring the jury to find that such a purpose was the "dominant, significant, or *motivating* purpose" of his travel.  But we have approved jury instructions on the intent elements of § 2241(c) and § 2423(b) that instruct the jury that the government must prove "beyond a reasonable doubt that a dominant, significant, *or motivating* purpose" of the defendant's travel was engaging in illicit sexual acts.  *Lukashov*, 694 F.3d at 1118–19 (emphasis added) (§ 2241(c)); *see also Lindsay*, 931 F.3d at 864 (§ 2423(b)).

Pepe argues that the instruction was at least wrong as to the intent requirement for § 2423(b) because Congress later amended § 2423(b) to specifically add "motivating" before "purpose," implying a "motivating purpose" was insufficient under the former version.  Because we have approved

"motivating purpose" as an instruction for § 2423(b)'s mens rea requirement for the pre-2018 version of the statute (the version Pepe was convicted of violating), *see Lindsay*, 931 F.3d at 864; *Flucas*, 22 F.4th at 1156–57, Pepe would need to show that our prior precedent is "clearly irreconcilable" with the amendment, *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *see Pepe*, 895 F.3d at 688 (preferring to read an amendment to "clarify[]" rather than change a statute's "scope" when "possible"). He has not done so.

Although we often presume that, "when Congress acts to amend a statute, … it intends its amendment to have real and substantial effect," *Pierce County v. Guillen*, 537 U.S. 129, 145 (2003) (cleaned up), "[t]he mere fact of an amendment itself does not [always] indicate that the legislature intended to change a law," *Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1985). After all, Congress may instead intend to clarify a "dispute or ambiguity, such as a split in the circuits." *Id.* (quoting *Brown v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 615 (7th Cir. 1982)). Congress's amendment of this statute is not clearly irreconcilable with our precedent upholding a "motivating purpose" as sufficient under § 2423(b) because Congress may have intended to clarify and confirm what had always been true— that a "motivating purpose" is sufficient for conviction. *See Lindsay*, 931 F.3d at 864; *Flucas*, 22 F.4th at 1156–57.

Second, Pepe challenges the formulation of the instruction, contending that at the end of the instruction, the district court should have restated the standard as requiring, "[i]n other words, the government must prove that the criminal sexual activity was not merely incidental." But a jury so instructed may have incorrectly equated "not merely incidental" with "a motivating purpose" and concluded that,

so long as the illicit sexual acts played any more than a "merely incidental" role in Pepe's actions, Pepe was guilty. *See United States v. Smith*, 831 F.3d 1207, 1219 (9th Cir. 2016) ("'Incidental' has a flavor that suggests that the standard is very low, even if that is not true as a definitional matter."). So the district court did not abuse its discretion in declining Pepe's requested addition to the instruction.

Pepe argues that a jury could think, without his requested addition, that a "merely incidental" result of a trip is sufficient to find that a "dominant, significant, or motivating purpose" of Pepe's travel was illicit sexual conduct. But the "meanings [of these terms] are within the comprehension of the average juror." *United States v. Dixon*, 201 F.3d 1223, 1231 (9th Cir. 2000). Pepe also argues that *Flucas*'s approval of the inclusion of "motivating purpose" in the instruction depended on the additional inclusion of "not merely incidental" to the travel. Although *Flucas* noted approvingly the inclusion of "not merely incidental," it did not hold that a district court would abuse its discretion by omitting it. *See Flucas*, 22 F.4th at 1159–60. More to the point, *Lindsay* approved the district court's instruction to the jury that the government must prove that "a dominant, significant, or motivating purpose" of the defendant's travel was illicit sexual conduct without any indication in its opinion that the district court gave the merely incidental instruction. *See* 931 F.3d at 858, 864.

Pepe further argues that the district court could have satisfied both parties' concerns by modifying the instruction to tell the jury that "the government must prove that the [illicit sexual conduct/engaging in a sexual act with a person under twelve] was *substantially more than* merely incidental." But that could have confused the jury as they tried to determine whether "substantially more than merely

incidental" requires finding illicit sexual conduct was more than a "dominant, significant, or a motivating purpose." The district court did not abuse its discretion in declining to add a clarification that could have left the jury confused.

Third, Pepe contends that the district court abused its discretion in not instructing the jury that "[o]ne does not have the requisite purpose/intent if the travel/crossing a state line would have still taken place even had a sex motive not been present." Pepe thus wanted the court to instruct the jury that the improper conduct must be a but-for cause of the travel. This court, however, has already established that a purpose can be "dominant, significant, or motivating" without necessarily being a "but-for" cause of an action. *Lindsay*, 931 F.3d at 864; *Lukashov*, 694 F.3d at 1118–19.

Pepe fails to show error or abuse of discretion in how the court instructed the jury.

## CONCLUSION

Sexually abusing children was one of Pepe's primary activities during his time in Cambodia. A jury convicted him of traveling in foreign commerce and crossing state lines with a motivating purpose of sexually abusing those children. And also for, in fact, sexually abusing them. The most Pepe shows in this appeal is that a jury could have rationally found that he did not commit these crimes. But that is not the standard. A rational jury could have found beyond a reasonable doubt that Pepe committed the charged crimes and the district court neither erred nor abused its discretion in instructing the jury.

**AFFIRMED.**